Good morning, and may it please the Court, Eric Grant for the United States. The Indian Child Welfare Act establishes minimum federal protections for the children of members of Indian tribes with whom the United States maintains a government-to-government relationship. Congress enacted the statute, quote, to protect the best interests of Indian children, unquote. After finding that the application of state standards resulted in the breakup of an alarmingly high percentage of Indian families, the District Court sustained a facial constitutional challenge to the act. Departing from the many state high courts that have sustained the statute throughout its 40-year existence, that judgment should be reversed in full. First of all, plaintiffs have standing to challenge only the record-keeping and information-sharing requirements of Section 1915E and 1951A of the statute and similar provisions of the 2016 rule. Only those requirements cause actual or imminent injuries to the state plaintiffs and can be redressed by a judgment binding on the person who enforces them against the states, namely the Secretary of the Interior. Accordingly, the court should adjudicate only those provisions, the lawfulness of only those requirements which are challenged only on Tenth Amendment grounds. Conversely, no plaintiff has standing to challenge and the court should not adjudicate any other provisions of the statute or the rule, including on equal protection grounds. On the merits of equal protection, the challenge provision should be upheld under the many Supreme Court decisions affirming that a statutory distinction based on membership in a federally recognized Indian tribe is not a racial classification at all, but rather a political classification subject only to rational basis review. As to plaintiff's Tenth Amendment challenge, ICWA does not commandeer states. Instead, it grants federal rights to certain individuals and sets federal rules of decision for state courts to apply to protect those rights. That is simply lawful preemption under the Supremacy Clause. As to plaintiff's non-delegation challenge to Section 1915C of the Act, that provision is not a delegation at all, but rather a continuing adoption by Congress of the laws of another sovereign, analogous to the Federal Tort Claims Act. For these reasons, the Indian Child Welfare Act is constitutional, but if the court finds some provision invalid, it should sever that provision pursuant to the Express Severability Clause in Section 1963. On the Presentment Clause issue referenced in the court's recent order or on any other issue, I would be pleased to entertain questions from the bench. Jumping into that Presentment Clause issue, first of all, the plaintiffs have forfeited any argument based on the Presentment Clause. Second, on the merits, the case cited in the court's order, the Washington Airport's case and line of authority does not apply here. That authority holds that Congress may not delegate federal executive power to an agent of Congress, and Congress may not delegate federal legislative power at all because it must exercise such power in conformity with the bicameralism and presentment requirements of Article I, Section 7. That's at page 276 of the court's opinion. But as I mentioned earlier, Section 1915C of the Act is simply not a delegation at all. As explained on pages 49 and 50 of our en banc brief, that provision is better understood as a continuing adoption of the laws of separate sovereigns. Counsel, let me ask you. I'm sorry, I interrupted you. I thought he said, I misunderstood what he said. Please, Your Honor, yes. I'm sorry if I was not clear. I may have misunderstood you, and they probably did so, but I thought you were inviting questions. Let me ask you on the assimilated crime, which I guess is where you get the language about continual adoption by Congress of the changes. Excuse me, it's one thing for that to exist in federal enclaves or on the outer continental shelf case that was discussed, which talked about that case law but didn't actually apply it there. It's something else to be applying it to states. It may not be a delegation. It may not involve presentment, but does, in me, involve the authority of Congress. Do you have any response to that, that this case law dealing with federal enclaves is just not applicable to what we're talking about? Well, Your Honor, I think it's an analogy. The, our point is that the assimilated crimes that under, with respect to the Assimilated Crimes Act, states would not have authority to legislate the criminality of acts or omissions on these exclusively federal enclaves. Nevertheless, Congress, in its legislative judgment, going back, as the Sharpnack case describes, almost 200 years, has adopted that set of laws. And originally, Congress adopted a static category of law existing on a certain date. But what Congress eventually did, and what the modern statute in 18 U.S.C. Section 13A does, is to make a continuing adoption. So, in essence, the law may, the state legislature may change the law, and yet Congress adopts that as federal law on a continuing basis. And in the Sharpnack case, the defendant, the criminal defendant there, made the same argument the state makes here, that that's an unconstitutional delegation. And the Supreme Court squarely rejected that argument. I guess the point, and responding to it in the best way that can be, the question really is, it's one thing to say in a federal enclave, where Congress could adopt all the laws that are necessary, and instead they adopt such laws that they want, and other laws are going to be state laws. Here we're talking about in a state itself, and in its adoption procedure, you still have that same authority, it seems to me. And so what is the authority of Congress to apply to a state, not to a federal enclave, the kind of law you're talking about? I think I understand, Your Honor. So, in the enclave context, it's Article I, Section 8, Clause 17, the very same clause that gives Congress exclusive power over the District of Columbia. In this case, with respect to Indian affairs, it's the Indian Commerce Clause of Article I, Section 8, the treaty power, and what the Supreme Court has called the United States pre-constitutional powers to deal with Indian tribes. And of course, how it's come down to us in the 21st century is that the Supreme Court has consistently described Congress' power in this field as plenary, and among other cases, the United States versus Lara case, L-A-R-A, from 2004, uses the plenary. I don't mean to interrupt, but we've got a lot of issues here. Now, you brought up Lara, and I see that case cited often as authority for the idea that Congress has, quote, plenary authority with respect to Indian tribes. And yet, as I read Lara, the court specifically says in that case that it's not dealing with anything concerning the authority of a state. So, and you read many of the plenary power cases, and they're not touching anything about states. They're touching relationships between Congress and the tribes. And so, one can understand why the authority vis-a-vis the tribes in Congress could be described as plenary in some sense. But here, as Judge Southwick was suggesting, we're talking about not just states, but the domestic relations power of a state. So, where's your best case in the plenary power realm? The idea that Congress can legislate with respect to state domestic relations law, with respect to non-Indians, and with respect to essentially creating a child welfare code for the state? To be sure, Your Honor, Lara itself does not involve state power. Several cases, I'll start with Washington versus Washington State Commercial Fishing Vessel Association, it's usually shortened to Fishing Vessel, dealt with the conflict in that case between state hunting and fishing laws and Indian tribes. And the Supreme Court upheld, in that case, a treaty that severely limited states' ability to regulate Indian hunting and fishing, even off state reservations. And, of course, the Supreme Court reaffirmed that principle with respect to a different treaty last term in Herrera v. Wyoming, which, again, involved state hunting and fishing laws, certainly advocated by states as at the core of their sovereignty and a very crucial state issue. I'm hearing nothing about domestic relations law. I'm hearing nothing about Congress being able to legislate with essentially a child welfare code. I'm hearing nothing about Congress being legislate with respect to non-Indians. Just sounds... Well, certainly, those cases involve non-Indians, both state regulators and the commercial fishermen who were allegedly aggrieved by the exercise of tribal hunting and fishing rights. I guess this is the case that presents that, and we've cited in our briefs, among other cases, Santa Clara Pueblo v. Martinez, where the court recognized the importance of domestic relations to Indian tribes. And this is an example of that plenary power, and it does cause friction with states. And our essential point about that is that the supremacy clause answers the question of how that friction is to be resolved. Well, the problem with your argument, though, Mr. Grant, is that the Supreme Court has told us that the power over Indian affairs is both plenary and exclusive. But that doesn't work for this particular act because it doesn't impose itself only on strictly Indian affairs or Indian territory. It imposes on an area that has been traditionally reserved only for the states, which is domestic affairs. So to the extent that it says plenary and exclusive, this act is beyond the realm of what Congress can enact. What do you do with the word exclusive? Your Honor, I think with respect, the best understanding of exclusive there is the power of Congress exclusive of the power of the states, that the states are disabled, disempowered from doing the kinds of things that Congress can do in this field. So you're disempowering states from conducting their own domestic affairs in terms of adoption, child custody, and regulation of family affairs. What Congress is doing here, Your Honor, is in the exercise of its Article I powers, one of its enumerated powers, is setting a federal floor. The statute, I believe, uses the term minimum federal protections in Section 1902, the establishment of minimum federal standards. And just in terms of... What you told us a few minutes ago was that this was enacted because, as you said, quote, the application of state standards resulted in a breakup of Indian families. So the application of standards that have been traditionally reserved exclusively to the states has now been intruded upon by the federal government. Yes, Your Honor, there was an intrusion. It was Congress's considered legislative judgment after considering evidence and holding hearings that's reflected in the legislative history that we cited in our brief that the application of those state standards were causing the breakup of an alarmingly high percentage of Indian families. And Congress chose, Congress could have, for instance, made the jurisdiction of tribal courts exclusive in certain circumstances. Congress could have provided jurisdiction to the federal district courts, but Congress took a middle ground by imposing procedural and substantive protections to be applied by state judges in state courts. And, of course... I think I just heard you say that Congress could have vested jurisdiction over these matters in federal district court. Is that what you said? Yes, Your Honor, under its... The position is that Congress could have vested the authority to adjudicate domestic relations matters in federal district court, which the Supreme Court has specifically disclaimed any kind of federal jurisdiction over domestic relations matters. So, Ankenbrant v. Richards. Your Honor, I believe... I think Congress has done that. I believe that Ankenbrant is an interpretation of the jurisdictional statute, Section 1331. And certainly, the court is correct that Congress has not done that. But our limited point is that when it is acting pursuant to its Article I powers, when it's in its proper sphere, Congress can confer jurisdiction on the lower federal courts. And, but again, took a middle ground here, left these proceedings, in state courts, and merely prescribed federal rules of decision to be applied by state courts. And that's authorized expressly by the text of the Supremacy Clause. To find that this is a preemption, we'd have to find that the legislation here, it was best read as legislating for private persons and not for states. Right? That's what Murphy says. And so, and that, I mean, I think that's the law. Yes. In most circumstances, Your Honor. And I think even Chief Judge Owen's dissent recognized that these, the provisions, some of the provisions challenged on commandeering grounds did apply equally to private parties as well as to states. Section 1912D, for example. Well, I read through ICWA. I read through the CFR on this. And I see numerous commands addressed to agencies and to courts. And so, it's difficult for me to understand how this statute is best read as legislation for private persons. It certainly seems like it's legislation that is addressing the state's own processes for regulating child welfare. Well, Your Honor, the state processes, state courts are not on the same footing as state executive branch agencies in this regard. State courts, as I believe Murphy itself expressly recognizes, are governed by the Supremacy Clause and the statement that the judges in every state shall be bound thereby. Bound by constitutional laws enacted by Congress. I see that my initial time has expired. Thank you. Morning, Your Honors. May it please the Court. My name is Paul Spruan, Assistant Attorney General from the Navajo Nation Department of Justice. Your Honors, the Navajo Nation, a treaty tribe, is here to defend the Indian Child Welfare Act as a statute that fulfills the federal government's treaty obligations to sovereign tribal nations. The main point we'd like to present to you today is ICWA does not violate equal protection for two main reasons. The first, ICWA's definitions are plainly, surely political on their face. And second, even if they were racial, ICWA fulfills strict scrutiny. Now on the first point, the appropriate analysis is to look at the statute itself and its definitions to see if Congress intended to create a political distinction or a racial distinction. Here there are three relevant terms that apply to the substantive provisions that plaintiffs challenge, Indian tribe, Indian, and Indian child. All three are purely political. They are directly connected to membership in a sovereign tribal nation with a government to government relationship with the United States. There's, yes sir. On this point, the statute makes a child, an Indian child, that the child is eligible for membership in the tribe, eligible for membership. So since you're representing the Navajo Nation, and there's one child in this case, I believe YRJ, that was made eligible by, for the statute for, eligible as an Indian child through eligibility for the Navajo Nation. Is that eligibility in this case determined purely by the child's blood? Yes sir. No, as we have suggested in our briefing, blood itself is insufficient. It is one element to be eligible to be part of the Navajo Nation and many other tribes. The eligibility for membership in the Navajo tribe, for the child in this case, is it determined solely by blood? No, it is not. What else is determinative of it then? You also have to be not enrolled in another tribe. The prior child of Rakeem's adopted ALM was eligible both in the Cherokee Nation and the Navajo Nation. What about YRJ? In YRJ, you also have to have a parent that is also an enrolled tribal member, in addition to the blood. If you do not have a parent, though YRJ does, you have to go through a more elaborate screening process. I'll try one more time. The eligibility of YRJ for the Navajo tribe, is it, eligibility, is it determined by whether YRJ has a quarter quantum of Navajo blood? That is one element. And also because the mother is also, it is not solely by blood, it is one element that having one quarter blood in addition to no dual enrollment, which YRJ does not, and a mother who is a member of the nation, which YRJ does. So to answer the question, in all cases, blood in and of itself is not the exclusive element for YRJ or others. The three relevant definitions here, Indian tribe, again, is connected to federal recognition. Indian child, as Your Honor has mentioned, has two prongs, both being a member or eligible for a member, and the biological child of a member. Now the reference to biology, and that is something that the plaintiffs have argued several times, is not a racial reference to biological connection. It is a familial connection to a parent who is an enrolled tribal member. As the Ninth Circuit distinguished between the uses of biology in a racial and non-racial sense, in the Davis versus Wong case, you can have a reference to biology, which is connected to familial relations, that is not racial in any sense. Let me ask a factual question here. Am I not correct that one of the children here had 3, 256 Indian blood? I believe that's a reference in the adopted couple case related to the Cherokee child in that case that was referenced, at least in terms of the Navajo child, as Your Honor has mentioned. That child has one quarter and therefore was eligible in addition to the other elements. But is it not also true that if a person has, is there a percentage blood requirement for membership in most tribes? Hard to say. Most tribes, I don't believe any party has surveyed exactly all the citizenship criteria, which vary considerably. I would say probably some do have, in addition to other requirements, obviously, a blood requirement, but also, such as the Navajo Nation, it may be dual enrollment, it may be a parent. And so it's hard to say. But I've been... In some circumstances, can't a tribe enroll somebody who has this minimal connection, even though the parents didn't enroll the child? I believe the question is related to this so-called automatic enrollment. And that is not something that the Navajo Nation does. It is not something that the Tenth Circuit said the Cherokee Nation could do. I'm unaware, other than the Hopi tribe, which I'm not sure if that's an accurate statement or not, where you can reach out somewhere and say, you're now a member, whether the tribe was legal rights to that child through the child welfare system or a parent. So it has to be a parent or a legal guardian in that case who has the ability. But you're not saying that a tribe, one of the 573 federally registered tribes, could not enact such a membership criterion under their sovereignty? Could they? Probably. Would it be binding on, say, a state through the Indian Child Welfare Act? There's a Tenth Circuit case concerning the Cherokee Nation where they said you could not do that, where you could not go out and purport to automatically enroll a child regardless of whether there's consent by a parent or a legal guardian. So could they as a matter of tribal law? Perhaps. Would that be binding in ICWA? Well, at least the Tenth Circuit doesn't think so. My short time is up. Thank you. Chief Judge Owen, and may it please the Court, my name is Adam Charnas, and I represent the Cherokee Nation, the Oneida Nation, the Quinault Indian Nation, and the Morongo Band of Mission Indian, four sovereign Indian nations with government to government relationships with the United States. As the panel correctly held, the district court's order holding ICWA unconstitutional is inconsistent with settled precedent and should be reversed. I want to start with the question of Congress's authority in the area of domestic relations and be very clear that our position is that it's a fiction that the states have exclusive authority with respect to domestic relations. In fact, as we set out in our opening panel brief, Congress has legislated extensively in the areas of child custody, child welfare, adoption, and foster care. That's not the point. In fact, that point cuts against you. It is, in fact, the case that for the most part, domestic relations, adoptions, child custody have been regulated by the states. But if Congress's authority here is plenary and exclusive, that means that the states have no authority in that area. It also means that anything that the states did before enactment of this statute would have been unconstitutional because the states were intruding on the exclusive authority of Congress. Well, I, certainly no court has gone that far in discussing what the state's authority is vis-a-vis Indian children. I think. But we have to address. Well, I don't think. Fundamental to this case. I don't think you have to address what happened 40 years ago, more than 40 years ago, where the states were permissibly acting with respect to Indian children on and off the reservation. The key point is whether Congress had authority in this area. And they did have as much authority as they did in the Adoption and Safe Families Act of 1997 and the extensive regulation of state foster care and adoption procedures in Title IV of the Social Security Act and in many other areas as well. The servicemen still. You agree, though, that if Congress had any authority at all, it was both plenary and exclusive. It has to be both. Well, I think with, on the reservation, I think that is certainly true. Outside of the reservation, I think to a large extent there's shared authority depending on what aspect of government regulation you're talking about. Not exclusive. Even though the Supreme Court has said numerous times that it is exclusive. I think the states have regulated behaviors of members of tribes outside of reservations for many years. And I don't think the Supreme Court's statement that the federal government's regulation is exclusive applies to that. I also point to there's been a number of Supreme Court cases addressing federal statutes, regulating things like retirement benefits for federal workers, retirement benefits for railroad workers and the like, where the Supreme Court has allowed Congress to change the domestic relations law of the states, preempt domestic relations law of the states. I'd like to sort of turn to the commandeering claim if I could. And, you know, the states here say that the statute commandeers their officials. And I think it's important to distinguish who is being commandeered. Because the Supreme Court said in New York and in Prince and in Murphy that state courts are different. The Supremacy Clause of the Constitution expressly contemplates, Justice Scalia said in Prince, that Congress would commandeer in a sense would direct state judges. And as the panel concluded and as Chief Judge Owen in her partial dissent concluded, the vast majority of ICWA is directed to things that state courts can do. How do you determine vast majority? Because one of the essential findings, there are a bunch of essential findings that a state court has to make, whether it's in removing a child from its parents or approving adoption, and those findings cannot be made without the state agency. Well, I, with respect, I disagree with that, Your Honor. I mean, the state agency has to show that it's in the best interest or that there is good cause or there is clear and convincing evidence. It has to show that it's taken, undertaken extensive measures to prove that it hasn't been able to find an alternative Indian placement and so on. But what Murphy says is if Congress regulates private parties and the states even handedly, that is not commandeering. With all due respect, how many private agencies are involved in removing kids from families? Adoptions have to take place with the approval of the state for the most part. And removing kids from their families has to take place with the child welfare agencies. Your Honor, there are numerous private foster care agencies and termination of parental rights is something that happens all the time with only private parties involved. For example, state... But what agency, private agency, has the authority to remove a child from a home? Well, Your Honor, what I point to is the set parent adoption situation. And that's a situation where only... ...remove a child from a home. Right. Well, there are private foster care agencies that do that acting under contracts with the state, which I concede might make them state actors for this purpose. But the point is that these provisions, both provisions that Your Honor pointed out in her dissent, 1912 D&E, both of them involve private actors as well, particularly in the context of termination of parental rights, which undoubtedly happens by private parties. Moreover, as we pointed out in our brief, you have to look at the definition of foster care. Foster care in the statute is defined as including guardianship. And as we pointed to, we have a footnote where we have at least half a dozen cases from different states indicating that guardianship proceedings, which again, count as foster care under the statute. Guardianship proceedings often involve only private parties. So for this reason, 1912 D&E often are applied in circumstances where there are private parties involved. And under Murphy, because that's the case, there's no commandeering. Let me ask you something on this topic. Judge O'Connor actually made findings with respect to the idea that Texas agencies are required to do a number of things under ICWA. And he made a finding in his summary judgment order that said that Texas DFPS, assume that means the Family and Protective Services Agency, has to do a whole laundry list of things, serve notice of suit, verify tribal status, make a diligent effort to find a suitable placement, show good cause if the preferences are not followed, and on and on and on. Are you contending that Judge O'Connor erred in making that finding that Texas DFPS actually does those things? Well, two things, John. First of all, there was no evidence presented in the district court. That was one of our objections in the district court. Second, each of those things is required of private parties as well. For example, in a step-parent adoption of terms, the Texas agency, that's not a court, must do all those things in response to ICWA. In some circumstances, yes, it must. And the Supreme Court has said in Murphy, if it's even-handed regulation of private parties and state agencies, that is not commandeering. And that's the situation here. Many of those requirements are prerequisites before the court can act. The statute is written as the court can approve certain action only if the following things are done. So those are requirements on courts, not on the agencies themselves. I guess my time has just about expired, so if there are no further questions, thank you. Thank you. Chief Judge Owen, and may it please the court, Kyle Hawkins for the State Plaintiffs. The Constitution does not give Congress the power to regulate domestic relations, but even if it did, Congress must wield that power consistent with the anti-commandeering doctrine of the Tenth Amendment and the non-delegation doctrine of Article I. ICWA is the rare federal statute that violates both anti-commandeering and non-delegation principles. I will discuss both of those arguments today. Mr. McGill, who represents the private plaintiffs, will discuss equal protection and the final rule. The Supreme Court has explained time and again that Congress may not command the states to carry out a federal regulatory program, yet that is exactly what ICWA does. As Judge Duncan observed a moment ago, ICWA commandeers states in provision after provision to implement the federal government's preferred family law policies. We see... ...commandeer the states in the statutes we're dealing with here today. As I read them, they're addressed to any party, could be a private person, it's neutral, and as Murphy said, if it's even-handed, that's not commandeering. And this is a facial attack on the statute. We're supposed to look at the statute, the face of it, and you don't have any evidence in this case. We don't know what the facts really are. So how can you say that just... You're assuming the answer. You're not telling us how the statute commandeers anything. Judge Dennis, the face of the statute commandeers the state executive branch, legislative process, and judicial branch. I will provide examples, and then I will say why that's not permissible as an equal, even-handed regulation of all actors. I'll begin with state officials. The most egregious example, Judge Dennis, as Chief Judge Owen identified in her panel of dissent, is section 1912D, which requires state officials to use active efforts to effectuate the federal government's preferred policies, and states must provide remedial services... The statute doesn't say states have to do the actual efforts. What it means is a judge must assure that that has happened in a case involving an Indian child. Judge Dennis... I'm sorry. That's all. Judge Dennis, those are directives to state agencies. The states are the only entity that does those types of things, because these proceedings are within our core sovereign power. And Judge Dennis, you don't have to take my word for it. The federal government concedes in the final rule that the active efforts language I just quoted is a directive to state courts and agencies, not to private parties. That's at 81 FEDREG at 38839. And indeed, Judge Dennis, the preamble to the final rule concedes that ICWA regulates state officials. In reviewing section 1915, the final rule says, and this is a quote, this language creates an obligation on state agencies and courts to implement the policy outlined in the statute. That's a clear-cut admission by the federal government that they are commandeering our state. There are also examples of commandeering of executive... There's been no proceedings involving these regulations, any testimony about it or anything that I know of. Your Honor, this... We were just looking at this statute and asking whether or not it commandeers anybody. And the statute does not say what you're saying this regulation says. Your Honor, this case comes to this court on a summary judgment record, and as Judge Duncan pointed out a moment ago, the district court made findings about the commandeering of state agencies. So there is a factual basis. What was that evidence? What did he base that on? The court can take judicial notice of how the state's rules and regulations that govern agency placements and decisions, can it not? That's correct, Judge Jones. That's basically what the judge was doing. I think that's correct, Judge Jones, and that's easy to do here with the face of the statute. Again, as Judge Duncan pointed out, it's line after line, directives of state agencies... Does any judge take judicial notice of anything in this case? Your Honor, whether the court wants to do it by a judicial notice or simply reading the record from the district court or simply looking at the face of the statute, the outcome is the same anyway. Section 1912 E and F, we have to find, hire, and pay qualified experts. Section 1915 E, we have to create records and maintain them indefinitely. There's notification provisions, as Mr. Grant conceded, in Section 1912 A and 1951. Now... I wanted to ask something that comes before the anti-commandeering issue, which is whether Congress had Article I power to act at all. Two questions. One, I didn't see Judge O'Connor ruling on that, so was that challenge preserved below? Assuming it was, question two, the suggestion that there's just a ban on Congress having anything to do with the state's domestic relations or family law, how do you deal with cases like McCarty from the Supreme Court that said the federal government could tell the states what to do with military retirement pay in the context of a family law divorce proceedings? So let me take those questions in turn. Your first question, I think, was whether this came up in district court. The answer is it was. We did bring up the Commerce Clause in district court. And the Commerce Clause is the basis for arguing that Congress lacks the power. An argument there boils down to the language of that clause, specifically the word commerce. Now we've seen in cases going back 40 years, the Supreme Court has talked about plenary power. But we saw in the 90s, the Supreme Court clarified that the Commerce Clause, the interstate commerce clause, is not unlimited. And the Indian Commerce Clause also is not unlimited. The decisions regarding plenary power should be read in a way that does not allow the federal government to regulate domestic relations, specifically the adoption of children who aren't members of Indian tribes. That's not commerce by any definition of commerce that I'm aware of. And that's the heart of our argument. The other cases they rely on about, cases like who owns what land and other matters related to hunting and fishing, commercial activities. That has a closer connection to commerce than who are the lawful parents of a child. I think the Supreme Court said that the Indian Commerce Clause is not to be measured by the interstate commerce clause. And it really is a symbol of plenary power. It's not just a regulatory power. Isn't that correct? No, Your Honor. The word commerce is the same word in the interstate commerce clause and in the Indian Commerce Clause. We regulate commerce with Indian tribes. Now, to the extent the Court has used plenary, that must be read in a way that does not include intrastate domestic relations. But even if I'm wrong about that, Judge Dennis, even if I'm wrong and commerce does have the power, the power still must be exercised in a way that's consistent with anti-commandeering. And we know that from cases like Prince. In Prince, the Supreme Court invalidated the simple background check that was imposed on state officials. Now, everyone in Prince agreed that keeping felons away from handguns is good policy. And everybody agreed that the background check at issue in Prince was minimal and temporary. It was just a quick background check. But neither of those things saved the statute because the Supreme Court said the federal government may neither issue directives requiring the states to address particular problems... Nothing like that in the Congress had said courts have to do the background check? I don't think it would, Judge Duncan. And the best example of that is when Prince notes that Congress may not command the state's officers or those of their political subdivisions. Now, I think that's an indication, Judge Duncan, that the prohibition discussed in Prince should be read broadly. Isn't it also true that ICWA doesn't just lay down purported rules of decisions for courts, but it also forces state courts, commands state courts to do administrative tasks, which is doing numerous notifications. I'm thinking of 1912A. I mean, surely that's subject to the commandeering analysis. That's exactly right, Judge Duncan. You mentioned 1912A. I'll also give you 1912B, 1915E, about state courts having to notify the Secretary of Appointments. Section 1917, Judge Duncan, is possibly the best example. That provides that state courts have to inform any Indian over the age of 18 of his tribal affiliation upon request, and any rights... Judges have to follow the federal law? Let him finish his answer before you can let him... I'm sorry. I just meant to say that courts are commanded to tell anyone who walks in the door of any rights foreign from that affiliation. Now, there are 570-some federal Indian tribes that could confer benefits, and ICWA requires our courts to keep up to speed on all of them. I'm sorry, Judge Jones. I didn't hear your question earlier. My question was, don't the state judges and courts have to follow the federal law? I mean, you're saying things like notification, notice, things like that. Why can't the courts follow the federal law and do that? Your Honor, what we learn from cases like Testa and Farrk is that the federal government can create a cause of action and require state courts to hear that federal cause of action in state court on equal footing with state law cause of action. That's not happening here. As these examples I've laid out show, this is the only way that Congress can affect federal state causes of action in state proceedings. Your Honor, that... As my colleague pointed out, the McCarty case, it created... Federal rules create a difference in the way the state must apply the community property law. There's innumerable situations where congressional law has changed the outlook of proceedings in state courts. Judge Dennis, that's all addressed in Section 5 of the Supreme Court's decision in Murphy. What that decision makes clear in Section 5 is that the federal government has the power to regulate individuals, not the power to regulate states. So when we have a comprehensive federal regulatory regime of individuals, like we see, for example, in the ERISA cases that they cite or in RESPA cases that impact mortgage foreclosures and things like that, when the federal government is regulating individuals, the laws that it passes pursuant to that regulation preempt conflicting state law. That's all Section 5 of Murphy. But when the federal government is simply ordering state courts and state legislatures and state officials what to do in their own causes of action brought under state law involving persons in that state who, in this case, aren't members of a tribe, that crosses the line under Murphy. Not only... Just a follow-up to your answer there. What do you do with the Service Members Civil Release Act, which is involving itself in the state causes of action, requiring statutes of limitations to be told, affecting custody decisions? Again, maybe just on timing, how does your argument affect that statute? That statute, like the other ones that they rely on, is permissible to the extent that it's regulating individuals. In ICWA, we don't see the regulation of individuals. The other side says that ICWA is imbuing them with rights, but that's not true. If that were true, those rights would apply everywhere. But ICWA only applies in state court proceedings. It doesn't apply in tribal court. It doesn't apply in federal court. That's the dead giveaway that Congress is not regulating individuals here. I'd like... Mr. Hawkins, does your anti-commandeering argument, if accepted, would it invalidate the entire law or only the law you keep referring to, not members of tribes? So insofar as ICWA covers Indian children who are members of tribes, does it commandeer the state? ICWA, to the extent that ICWA is regulating tribes and tribal jurisdiction in tribal proceedings involving tribal members... I don't mean that, because 80% of Indians apparently live off reservations. But a child can be born and a member of an Indian tribe and live off the reservation. So that is an instance where ordinarily the state would have to follow ICWA. And you keep drawing this distinction in your argument between non-Indian children and children who are not members of tribes and those who are. So do you see what I mean? Your Honor, I don't mean to draw that distinction. There's still a commandeering problem, even when the proceeding involves a child who is already a member of a tribe. Whether Congress can regulate that or not, it must be so consistent with anti-commandeering. So my argument would be the same there. I'd like to, if I may... What exact relief do you seek, then? What is the limit? What is the relief? We seek the relief that the district court ordered, declaring the provisions of ICWA that we have challenged unconstitutional and no others. And that's what the district court did in its final judgment. I'd like to document, if I might briefly, the commandeering of the state legislative process. Now, Justice O'Connor's majority opinion in New York v. United States holds that Congress cannot effectively bypass the state legislative process and substantively change the enacted policies of the states. We see that in ICWA Section 1915a, which is the smoking gun on this point. ICWA 1915a says in adoption proceeding, quote, under state law, a preference shall be given, unquote. That phrase, under state law, is the dead giveaway that ICWA is rewriting substantive state law in contravention of New York. That's directed to the state judge? And can't Congress do that? Your Honor, that is telling state courts to apply a law that's contrary to the substantive law that the state legislature has enacted. In Texas law, proceedings to terminate parental rights are governed by a best interest of the child standard. Congress is rewriting that as a matter of state law and telling state judges to apply it in 1915. I see it. If it's properly enacted, the Supremacy Clause requires that the state court follow that law, doesn't it? I'm having trouble hearing you, Your Honor. I said, if it's properly enacted, the Supremacy Clause requires the state court to follow the law. Your Honor, it's not properly enacted. It violates the Tenth Amendment. That's the problem with these provisions. I see I have limited time, and with the Court's permission, I'd like to turn briefly. Judge Elrod's question about relief, and you said it would be a declaratory judgment affirming what the district court did. Can you respond in light of that to the redressability arguments the other side makes that since no state court, which are the ones that handle these proceedings, would be bound by a Fifth Circuit federal decision that there's no redressability to any injuries that exist here? That's not the case, Judge Costa. We deal with adoption proceedings involving Indian children, and in those proceedings, our state officials, our courts, and our legislative process all have to follow ICWA. The declaration that we don't have to do so means that we can do away with that administrative burden and not risk loss of federal funding. The state courts say, I disagree with the Fifth Circuit. I'm going to apply, say, the preferences for, you know, children of tribe members. The state court, as we understand it, and I think Mr. McGill will speak to this, does intend, at least in this case, to follow what the Fifth Circuit says, but in any event, the state officials and the state legislative process are also commandeered, and the declaration that Judge O'Connor entered would redress that injury. In my brief remaining time, I'd like to touch on the non-delegation point, and our argument here is very simple. Congress cannot delegate to an Indian tribe the power to write substantive law that binds state courts in interstate proceedings involving people who aren't members of the tribe. Yet that is exactly what ICWA does. This is literally unprecedented. The Supreme Court has never permitted this type of delegation, and we see the problem arise in Section 1915C, which says, which gives tribes the power to establish a different order of preference by resolution, and that the court or agency shall follow such order in those cases. That is a legislative delegation to a tribe to reorder the preferences that Congress has set forward in 19A and 19B. At least one... You'll recall that in order for the federal government to regulate migratory birds, they had to enter into treaties with foreign countries. These tribes are treated as foreign countries. They are not normal state-federal relationships. Now, why isn't the fact that the statute deals with tribes that are equivalent to foreign nations, putting it outside of the law you're quoting? Well, let me make three points, Judge Wiener. Number one, they don't claim that a specific treaty authorizes this. They haven't pointed to one, and I'm not aware of one. Second, even if there were a treaty saying Congress has to do this commandeering, that treaty would be on par with the statute under the Supremacy Clause, and that means that it would have to comply with the Bill of Rights, including the Tenth Amendment. Rights trump powers. And so any authority that Congress gets, whether from treaty or statute or something else, still has to comply with the anti-commandeering doctrine. Third, as to treating them as a separate sovereign, Your Honor, that's exactly the problem. If Congress were to pass a law giving Her Royal Highness, the Queen of England, the power to write rules that govern divorce proceedings here in Orleans Parish, Louisiana, it would be declared unconstitutional in the blink of an eye. And 1915c has the same problem. It's giving a subordinate sovereign the power to write law that binds state judges in Texas adjudicating state law causes of action. That's never been permitted before, and it should not be permitted here. I see that I'm effectively out of time. Unless the Court has any further questions, we would ask the Court to affirm. Thank you. Thank you. Thank you, Chief Judge Owen, and may it please the Court, Matthew McGill for the individual plaintiffs. My clients opened their hearts and their homes to a child in need and embraced that child as a part of their family. They are here because the Indian Child Welfare Act's placement preferences turned their lives and their families upside down, solely because the child they took in is an Indian child, and they are not, and cannot be, because of their race, Indian families. Unbelievably, the Brackeens are living this nightmare now for a second time. Once again, their family is at risk of being torn apart as the Navajo Nation, to use the Supreme Court's words from Adoptive Couple, has played the ICWA trump card in an effort to thwart the wishes of YRJ's mother that YRJ be placed with the Brackeens, something that the Navajo Nation can do only because YRJ's mother is Navajo and YRJ has the requisite blood quantum. And to get to your question, Judge Duncan, that you put to Mr. Spruhan, in the YRJ proceeding in Texas State Court, the Navajo Nation, to prove up the YRJ's enrollment in the tribe, submitted a document entitled Certificate of Navajo Indian Blood. That is the document by which the Navajo Nation said that she was enrolled as a member, number 557640 of the Navajo Nation. Does that mean if YRJ had one-eighth Navajo blood, ICWA would not apply? No. ICWA applies to any child who is either an enrolled member or eligible and the biological child of a member. And in YRJ's case, according to the Certificate of Indian Blood, she is half-degree Navajo blood. What's the limit? That depends on the tribe. Some tribes, as Judge Jones elaborated, in adoptive couple, the baby there, baby Veronica, was 3256 Cherokee, but she was nevertheless first eligible and then made a member of the tribe. And as the Supreme Court recognized in adoptive couple, that raises serious equal protection concerns. Well, I have two responses to that. First, with respect to the Indian child definition, it's not merely familial. It requires a biological tie. If the child were adopted and otherwise eligible, he or she is not an Indian child. They have to be a biological tie to the parent. And the committee report in explaining that biological requirement said that it was included because blood relationship is the touchstone of someone's entitlement to tribal property and tribal culture. Blood relationship. That is what Congress was regulating with ICWA. The defendants wave away... No. I think the central lesson of Rice versus Cayetano is that a tribal classification could be political or it could be racial. And the central issue in this case on the equal protection side is, is it a political classification or is it a racial classification? And what Rice teaches us is that when Congress is regulating the internal affairs of an Indian tribe, it's obviously political. But when it's regulating state affairs, it's not any longer political. It operates in that domain as a racial classification. And the reason why is that when you are in the realm of state affairs, you are implicating almost by necessity the rights of non-Indians. And as in the Brackens here. And when you are a non-Indian who is subject to a tribal classification, you cannot join the preferred class because of your race. There's nothing the Brackens can do to join the Navajo Nation because they lack the requisite blood quantum. And that is what... And so our central submission here is that when a classification operates in state affairs to the direct disadvantage of non-Indians, as ICWA does, in that context, it's racial. And that... The argument is pretty forcefully made on the other side that if we accepted that argument, we would blow up most of Title 25 because Congress often legislates with respect to the classification of Indian. Now that's a deep concern. What is your response? I have two responses. First, Rice versus Cayetano has not resulted in the elimination of any other laws providing benefits to Native Hawaiians. And there are dozens of them, as the United States itself elaborated in its amicus brief in Rice. And there is no other provision of Title 25 that directly disadvantages non-Indians in a state proceeding in the way that ICWA does. There's nothing that even comes close. It is a direct disadvantage placed on non-Indians in state affairs that are of the utmost importance to these people. These families, the Cliffords family, literally was torn apart as child P was pried out of their arms because she was an Indian child. The Minnesota court had held that the Cliffords had established good cause, just not by clear and convincing evidence. And therefore, the whole thing changed. If ICWA hadn't applied to child P, she would still be with the Cliffords. If the Cliffords had been an Indian family, would ICWA have still applied? Would they still have to jump through the hoops? ICWA applies to any Indian child. And then the preferences kick in. And in the order of preferences, the preferences go one, you know, family, two, tribal member, three, any Indian family, any member of any of 573 Indian tribes. So it wouldn't have applied to the – the Cliffords would have been subject to the preferences anyway because child P ultimately was placed with a grandmother. The competing placement was a family member. So they would have had to overcome the preferences. They wouldn't have been in Category 3 of the preferences. They would have been a Category 3. They would have been less preferred. So – Doesn't the existence of Category 3 strongly imply that this is a racial classification rather than a political one? Absolutely it does, Judge Jones. Tribes don't consider themselves totally fungible with other tribes. And so if you just use the generic Indian, it's like saying, you know, generic Hispanic or something. In the district court, the United States said that the purpose of ICWA was to keep Indian children in the Indian community. They didn't make that up. That comes out of the House report, and it's also quoted in the Supreme Court's decision in Holyfield. That is, in my view, just a naked and transparent racial classification and racial objective. Simply to say we're going to put any Indian child with any Indian family is the very definition of a racial categorization. And that does strongly suggest that – Technically, a family could qualify that did not have Indian blood but that was a member of an Indian tribe. It's hypothetically possible. A person – a child that is not biologically related to a tribal member through the parent would not be an Indian child. But it is hypothetically possible. But the Supreme Court in Rice v. Cayetano rejected exactly this over-inclusive, under-inclusive argument with respect to the classification there. It was argued that Native Hawaiians were not like an Indian tribe because the classification includes some who were not fully Native and others who were from the Marquesas Islands rather than Polynesia. And the Supreme Court batted that away and said the fact that something is slightly under-inclusive or slightly over-inclusive does not make it any less racial. It makes it maybe slightly less precise, but the racial intent is still there. And that is what – Because it allows them to go to Indian family, not the family of the particular tribe they're associated with. Doesn't that involve a huge class of federal statutes like the Title VII Indian Preference Exemption, which says if you're near a reservation, Indians get an exemption from – you can give them a preference. They don't have to be a member of the tribe that controls that reservation. So I think Rice answers this, Judge Costa. I mean, Rice says it does not follow from Mancari that a Congress may authorize a state to establish a voting scheme that limits the electorate to a class of tribal Indians. That would not, as Rice itself elaborates at page 519 of the opinion, that has no implication for the numerous statutes by which Congress may, quote, fulfill its treaty obligations and its responsibility to the Indian tribes. What makes ICWA different than those other statutes is the way it directly disadvantages non-Indians in state affairs. The state – you're not drawing – you're not really relying on the political versus racial. You're relying in part on that, but your overlay is also the state affairs. I understand on the other issues the state was just arguing about is a factor. I didn't realize that was a factor. Well, this is the distinction that Rice draws. Justice Kennedy's opinion for the court in Rice – It's a state statute. Well, it actually was a state statute authorized by Congress, and it was treated by the Supreme Court as if it were a federal statute. So that's – I would submit as of no moment. But the opinion says what makes – Mancari was a limited exception – that's a quote – confined to the authority of the BIA, an agency characterized in Mancari itself as sui generis. And it could not be extended to the new and larger dimension of state affairs, specifically a state election. You don't have to go anywhere near that statute to invalidate ICWA, because that does not directly disadvantage non-Indians in the same way. It doesn't implicate state affairs. They can't go kill animals they want to shoot. No, I would submit, Your Honor, that you don't need to get anywhere close to that. That ICWA is – Can I ask you a question about Rice? Yes. I read Rice as Justice Kennedy's majority opinion as reaffirming the congressional legislation involving federally recognized tribes. He distinguished that from Hawaii's treatment of descendants of ancestors. He said that was a – it was a proxy for Rice. But he did not say that about Congress's many statutes and laws favoring federally recognized Indian tribes and their members in the continental United States. He didn't say that there's anything wrong with that. So Rice does not, in my mind, does not take away Congress's authority to enact ICWA and all the other statutes that it has done up to this point. Your Honor, I think – I can't agree with that reading of Mankari because of what the opinion says. It's page 520. In the language I've already quoted. But it says it does not follow from Mankari that Congress may authorize a state to establish a voting scheme that limits the electorate to tribal Indians. Congress could not have a tribal classification for an election. So that is – that, in that context, the court said at page 522, the classification would be a, quote, racial classification because it fences out whole classes of citizens from decision-making in critical state affairs. And that is very much what ICWA does. It fences out non-Indians from these state proceedings. It literally is keep off a child that is an Indian child in a state proceeding. They are fenced out. It is undeniable that these state proceedings are critical state affairs. Palmer v. Sidati says they involve state interests of the very highest order. If a tribal classification is not permitted in a state election, it shouldn't be permitted in a state court proceeding. That is our core submission under Rice v. Cayetano. If I might now, I want to turn to the final rule and specifically the requirement of clear and convincing evidence because it is vitally important to the Bratkins. As a result of the second court of appeals decision in the case concerning YRJ, they have a trial that has to take place within 180 days. And the second court of appeals has said they have to show good cause by clear and convincing evidence citing the final rule. So this matters. And if you want to know how much it matters, look only to what happened in their case involving ALM where they had proven good cause, the judge said, but not by clear and convincing evidence. This matters. It changes the outcome of cases. It was outcome determinative in both ALM's case and the Clifford's case, and it is contrary to the statute. We start with the presumption that the default rule in civil litigation is preponderance of the evidence. And then on top of that, the Supreme Court's decision in Grogan v. Garner says that statutory silence is inconsistent with the view that Congress intended a heightened standard. But here it's not just statutory silence. We have the expressio unius principle, which says that here Congress, where it wanted a heightened standard, in Section 1912 it has two different heightened standards. It knew where to do it. It knew how to do it. And the decision not to include a heightened standard with respect to good cause in Section 1915 is presumed to be intentional. The panel opinion criticized the district court for relying on the expressio unius principle, but citing a decision of the D.C. Circuit. But this court has relied on it numerous times at Step 1 of Chevron, including in the Chamber of Commerce case. But unlike the D.C. Circuit case, where at Step 1 of Chevron the challenger to the regulation was relying only on the expressio unius principle, here we have Grogan v. Garner. It is the background default rule that says in civil litigation it's preponderance of the evidence. And the defendants have not had one breath of response to Grogan v. Garner. They didn't cite it at all in their briefs. They've never had an answer to it. The only answer they ever provided was in the district court. They cited Microsoft v. I for I, which is a case I know pretty well because I lost it. And in that case, the Supreme Court held that Grogan v. Garner was inapplicable because the statute there did actually textually indicate a decision to have a heightened burden. There is no indication of a heightened burden here. In fact, all of the indications are to the contrary. The legislative history indicates that Congress wanted state courts to have flexibility to do justice in individual cases. And the Interior Department here has basically overridden that, supposedly to create uniformity in the outcomes of these cases, to create uniformity, which is to say to make non-Indians lose more often. And that defies what the statute was all about at the time. I don't think it does, Your Honor. It certainly doesn't affect any of the challenges, the Article I challenge, to the Congress's ability to enact the statute at all. And it doesn't really change the core of the commandeering argument. I mean, states still, state courts still are required under state law to apply a preference. I think states have always felt controlled in terms of active efforts and having to fulfill notification requirements in that way. But certainly the final rule takes the commandeering and turns it up to 11. It removes from state courts even the limited discretion that it will provide to them to do justice in individual cases. With one or more of your arguments, would your answer to the question that was propounded regarding severance be the same as the question that was propounded to your fellow counsel on this side? May I answer, Chief Judge Owen? My clients have challenged only three provisions of ICWA, 1913d, 1914, and 1915, because those are the ones that apply to them. If you agreed with me that the Indian child classification is a racial classification, then under Murphy you could not sever and sustain other provisions that contained the same constitutional defect. So that, I think, is one way you would get to where Judge O'Connor went. Another way is through the pervasive commandeering that the statute actually does entail. Thank you, Your Honor. We were talking most recently about the final rule and the clear and convincing evidence standard. It's the position of the United States, as reflected in the text of the rule, that that standard is not meant to be binding on state courts. The text of the provision, Section 23.132b, uses the word should, and the preamble explains that the provision advises applying that standard but does not categorically require that outcome. To go back to commandeering, and particularly Judge Duncan's point, this is a quote from New York v. United States, 505 U.S. 178-179. Federal statutes enforceable in state courts do, in a sense, direct state judges to enforce them, but this sort of direction to federal judges is mandated by the text of the Supremacy Clause. You just made my point for me. They're enforceable to the extent that the Supremacy Clause makes them enforceable. You have to do a Supremacy Clause analysis to see whether these directives to state courts, say to change the burden of proof or to change the preferences, are actually preemption, right? Yes, Your Honor, and certainly it has to be within Congress's Article I power. Congress can't just order a state court to do something. It can preempt contrary state law. And that's precisely what Section 1915a, for example, the preferences does. Notwithstanding state law, Congress has provided a federal rule of decision to be applied by state judges. And that brings me again to redressability because there's been no good answer to the point that, except for those two specific provisions that I identified, a judgment in this case will not bind the actors that apply ICWA on a day-in, day-out basis, namely state judges and state courts. Let's go back to the commandeering question just a minute, Mr. Grant, because the thing that you conveniently overlook is the commandeering of the state agency. In Texas, as you know, Children's Protective Services engages in months and sometimes years of studies and family background and interviews and careful review of every adoption procedure. And in most cases, as you know, the court proceeding is a 10-minute footnote at the end. The imposition on the state judges is minimal compared to the imposition on sometimes scores of agency workers who study a case and adjust all of the various preferences and concerns. And it's an extremely involved and expensive process. And this Act commandeers all of that, irrespective of whether it commandeers state courts. With respect, Your Honor, our point is not that these are trivial impositions. They're very important. But again, as the text of Section 1912B begins, it applies to any party seeking to effect a foster care placement or termination of parental rights. And Chief Judge Owen's dissent, page 51, note 17, cites several state statutes that show how those particular kinds of proceedings will involve private actors as well as state agencies. You think Prince would have come out differently if the law said any party has to do a background check and all the state officials, the sheriffs, then would have been out of luck in Prince? Well, I'm not sure about Prince, Your Honor, but Reno v. Condon a few years later, the Supreme Court unanimously upheld an imposition that applied both to state agencies and to private actors. Were the states acting as a market participant in driver's license information? This is the state acting as sovereign in its core sovereign capacity in child custody proceedings. I understand that distinction, Your Honor, but I think the key there, and as reiterated in Murphy, is when the burden is applied both to states and to private actors, that's not a commandeering. I would like to finish with standing. I've mentioned redressability. The Texas court, its December 19th decision at the very end, star page 18, did not wait for this, is not going to wait for these federal proceedings, told the trial court to consider the constitutionality of ICWA as an original matter. And so that's a fatal defect in the entire case here except for those two minor provisions. Judge Costa, with respect to the question about whether the district court addressed the plaintiff's argument that Congress lacked authority under Article I to adopt ICWA, it's clear if you read the district court's opinion that it did not address that. Pages 46 to 47 of his opinion, Judge O'Connor said plaintiffs also claim Congress did not have the constitutional authority to pass a bunch of sections of ICWA under the Indian Commerce Clause, defendant's counter, plenary authority. And the court said, but as shown above, Murphy, Murphy, commandeering case, does not permit Congress to directly command the states in this regard, even when it relies on Commerce Clause power. Therefore, plaintiffs' request for a declaration that these sections are unconstitutional is granted. Judge O'Connor never addressed the question about whether Congress had authority to enact the statute, and plaintiffs never cross-appealed that. That same page of the opinion as issuing a declaratory judgment that ICWA is unconstitutional and is beyond Commerce Clause power is referring back to the anti-commandeering because there's one prong of the supremacy clause also deals with Congress' power. But it's a separate section of the opinion. It's a separate section of the opinion, but the rationale was commandeering. The second point I'd like to make, which hasn't come up yet with respect to commandeering, is the spending clause. The plaintiffs alleged in their complaint that they would lose federal funding if they failed to comply with ICWA. And as the Supreme Court has said over and over again, if Congress acts under the spending clause, then it can require states to do things that it otherwise couldn't under the commandeering principles. And plaintiffs' allegations in the complaint that were accepted by Judge O'Connor as a basis for their standing in this case, one of the basis for their standing in this case. And we think that, as sort of a matter of judicial estoppel, binds them here. And the spending clause, if ICWA today is a spending clause piece of legislation, that means the commandeering principle simply doesn't apply. Are you saying that if the state refuses to accept the funding, ICWA no longer applies? No, I'm not saying that. What I am saying, though, is that these three states have accepted hundreds of millions of dollars for the federal government, conditioned on their compliance with ICWA. And by accepting that condition, they have waived any claims for commandeering. There's been some discussion, or a lot of discussion, about whether a blood quantum is required. And so a suggestion that that makes this a racial classification, that is unconstitutional. Well, Mancari itself refused that. The hiring preference at issue of Mancari required two things. First, it required the employee, prospective employee, to be a member of a federally recognized tribe. And second, it required the employee to be at least 25 percent of Indian blood. This Court's decision in Peyote Way, which had an exemption from federal drug laws for use of peyote, similarly required a one-quarter blood quantum of Indian blood. So if the requirement that there be Indian blood is a problem or is an issue, the Supreme Court and this Court have already resolved it. The whole inquiry, I think, into the blood relationship with a parent is misplaced here. Blood relationship with a parent is a common test going back centuries for citizenship. Let me ask you just, we assume that. But I have a question. How far do you extend your rationale? Because suppose Congress decided that because there's this understanding, and this is purely hypothetical, not pejorative, but suppose Congress decided that Native Americans were particularly subject to alcohol abuse and that when they were off the reservation they got into an excessive number of DUI cases and they were treated excessively harshly. Could Congress pass a law that enacted a new sentencing regime for, quote, Indians defined similar to this who get into DUIs? Well, I think the answer is that if any federal scheme that is tied to tribal membership, Congress has plenary authority and the question would be whether such a statute... So the Indians are like the Romans, the ancient Romans, who carried Roman law with them wherever they went. Is that what you're saying? Well, I'm saying that perhaps is the case to the extent that Congress says so. It's not the case without it. So there's no limit to that principle? No, of course there's a limit. What is the limit? The limit is a rational basis test. And then Carrie herself, the Supreme Court, said that if there was a hiring preference throughout the federal government... Why isn't there a rational limit based on the state's historical understanding of the welfare of its citizens and its ability to decide the welfare based on the best interests of the child? Why is that not a reasonable limit? Joan, may I respond? Sure. Well, the reason is from the beginning of the Republic, as the Mekus briefs in this case show, from the beginning of the Republic, Indian children have been the subject of policymaking and legislation by the federal government. Thank you.